IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY CHISLEY,                    *
                 Plaintiff,

       v.                        *          CIVIL ACTION NO. DKC-13-2973

WARDEN,  et al.,                *
               Defendants.
                        ***

## MEMORANDUM OPINION

Pending is a Motion to Dismiss, or in the Alternative Motion for Summary Judgment filed by Defendants Laura M. Booth,[1] Norma Holwager, Bruce Liller, Amanda Tart, and former Warden Bobby P. Shearin.  ECF No. 18.  Plaintiff has responded.  ECF No. 21.  Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the dispositive motion will be granted.

### Background

Plaintiff Anthony Chisley, an inmate held at the North Branch Correctional Institution ("NBCI"), filed the instant civil rights complaint, alleging that in August of 2010, he was placed on administrative segregation due to his mental health/psychological status.  ECF No. 1, p. 4. Plaintiff alleges that since that time he has been denied medical treatment for his mental illness and his assignment to administrative segregation exacerbated his mental illness.  *Id.*

In support of his claim, Plaintiff states that on August 20, 2013, he was advised that he would be transferred from security housing to Unit 2 of the general population building, where special needs inmates were housed.  He states that when he arrived in the housing unit he was instead assigned to a unit where non-mentally ill inmates are housed.  He states that he told custody staff that he had enemies in the institution and that housing him on the tier compromised his safety.  *Id.*, p. 5.

---

[1] Booth is referred to as Laura Mouldon by Plaintiff.  The Clerk shall amend the docket to reflect Defendant's proper name.

Plaintiff states that he complained to Psychology Associate Tart, Ms. Holwager, Bruce Liller, and Laura Booth on several occasions regarding his housing assignment and lack of mental health care.  He states that Defendants failed to take any action to have him moved to the mental health tier or address his concerns that he was not receiving adequate mental health care.  *Id.*, p. 6. Additionally, Plaintiff alleges that Shearin was also made aware of his improper housing assignment and lack of access to mental health care but took no corrective action.  *Id.*

## Standard of Review

A.    Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007).  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id.* at 563.  The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B.    Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but

whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

A.    Supervisory Liability

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that:   (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal

4

link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Plaintiff's claims focus on the delivery of primary health care. These claims as asserted against former Warden Shearin fail. Plaintiff has pointed to no action or inaction on the part of Shearin that resulted in a constitutional injury, and accordingly, his claims against Shearin shall be dismissed.

B.     Medical Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face

of the serious medical condition. *Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris,* 240 F. 3d 383, 390; citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider,

exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48.

The record evidence demonstrates that the Special Needs Unit ("SNU") at NBCI is a 40 bed treatment unit situated on a general population wing in Housing Unit 2-C Wing. ECF 18, Ex. 4. The SNU is governed by a multi-discipline treatment team and was designed to improve the conditions of inmates with severe mental illness by providing more structure, increased treatment services and a therapeutic milieu. The therapeutic environment was designed to provide a more comfortable and secure environment so that all inmates were more likely to participate and progress in treatment. Inmates who are deemed predatory or destructive are not appropriate candidates for SNU as they would disrupt the treatment of other inmates and interfere with the therapeutic setting. *Id.* In order to determine if an inmate is eligible for placement in the SNU an assessment is conducted by psychology staff, including a review of the inmate's diagnosis, a behavioral assessment, and assessment of the inmate's level of functioning. *Id.* Plaintiff remained housed on Housing Unit 2 while being assessed. *Id.*

Amanda Tart, Licensed Clinical Professional Counsellor, at NBCI, avers that on August 20, 2012, Plaintiff was moved from Housing Unit 1-Tier A to Housing Unit 2-Tier D as part of a larger move of several inmates which was being conducted by the psychology department. Tart states that she met with Plaintiff and notified him of the impending move but does not recall his expressing concern about the move because his assignment to "administrative segregation psych"

would remain unchanged.  *Id.*, Ex. 2.   Laura M. Booth, a Licensed Clinical Professional Counselor assigned to NBCI, confirms that Plaintiff was moved to the SNU in a good faith effort to assess his ability to comply with the treatment expectation of inmates housed on Tier C.  *Id.*

Booth assessed Plaintiff's suitability for the SNU and determined he was not an appropriate placement given his demonstration of predatory behaviors.  *Id.*  At the time of his assessment, Plaintiff did not exhibit Axis I mental health symptoms; rather, he demonstrated symptoms consonant with an Axis II diagnosis of Borderline Personality Disorder as well as other traits of personality disorders, including Antisocial Personality Disorder.  *Id.*

Booth states that Plaintiff's symptoms of Borderline Personality Disorder make him a poor candidate in a therapeutic relationship as he maintains adversarial relationships with his care providers.  *Id.*  Booth states that in 2013, there was documentation supporting mental health staff's observations of Plaintiff's pervasive and deep rooted tendency to manipulate others and disrupt the environment.  Specifically, Booth notes that Plaintiff made inconsistent reports of  his symptoms to psychiatry versus psychology staff.  He demonstrated "manipulative qualities, poor boundaries, incited other inmates, yelled loudly on the tier, masturbated and verbally assaulted female staff, and fabricated false information.  He was noted to be high functioning and was taking advantage of more vulnerable inmates and encouraging them to act out and hurt themselves."  *Id.*, p. 2.

After the assessment, he was repeatedly advised that he was not eligible for SNU.  He was removed from Administrative Segregation and psychology staff encouraged him to return to general population when his disciplinary segregation sentence ended.  Booth avers that it is standard protocol or mental health providers to encourage their patients to return to the least restrictive environment, i.e. general population absent any security concerns.  Staff attempted to

mainstream plaintiff into the general population but he refused and remained in the Special Management Unit (Housing Unit 1) on disciplinary segregation. *Id.*

Bruce Liller, Mental Health Program Director at NBCI confirms Booth's assessment of Plaintiff and avers that Plaintiff develops an adversarial relationship with his mental health treatment providers. Additionally, Plaintiff has been observed preying on more vulnerable mentally unstable inmates. Liller notes that Plaintiff's behavior is not reflective of an Axis I mental disorder, but rather more reflective of a personality characteristic and shows a strategy to navigate through prison life. Liller states that Plaintiff frequently engages in self-diagnosis and "maintains a mindset of entitlement based on his own assessment." *Id.*, Ex. 1. Liller believes Plaintiff's actions are for the secondary gain of manipulating his housing assignment, and indicates that Plaintiff fixates on minute details as a means of challenging his mental health care providers. Liller avers that Plaintiff has demonstrated a limited ability to benefit from individual therapy sessions, particularly where the sessions focus on assisting him with coping with the stress of living in general population. Liller notes that Plaintiff uses individual therapy sessions to convince mental health staff that he requires a single cell. Liller notes that the evidence suggests Plaintiff does not require single cell status but Plaintiff refuses to consider other coping strategies. *Id.*, Ex. 1, p. 2.

Likewise, Tart confirms that Plaintiff uses his mental health status to obtain special housing. *Id.*, Ex. 2. She avers that during sessions with her, Plaintiff's primary concerns were related to safety issues surrounding his fear that he would be harmed by gang members if he was removed from administrative segregation and returned to general population. Plaintiff's concerns did not arise from mental health issues, but rather from safety concerns due to gang violence. *Id.* Tart avers that she has no knowledge of any concrete substantiation of a threat to Plaintiff's safety

and that she directed Plaintiff to raise his concerns of gang violence directly with custody and intelligence staff. *Id*., p. 2

Booth confirms that Plaintiff's ongoing justification for refusing to return to general population is his deep rooted irrational belief that all other inmates want to kill him for being a "snitch." *Id*., Ex. 4.  Booth and Liller assembled a team of supervisors from psychology, case management, and intelligence to conduct an investigation of Plaintiff's claims regarding enemies. His claims were determined to be unfounded and no information was uncovered to substantiate them. *Id*., Ex. 4.

On February 20, 2014, Plaintiff was removed from Administrative Segregation-Medical Housing due to a lack of Axis I symptomology, or any other symptoms that would have prevented him from being housed in a less restrictive environment.  On that same day he moved to Housing Unit 2, Special Management Housing, in order to complete his disciplinary segregation sentence. He refused housing and was issued a notice of rule violation for his refusal.  On April 7, 2014, he was found guilty of the rule infraction and received 30 days of disciplinary segregation.  *Id*.

Booth avers that Plaintiff was seen by mental health professionals on August 20, October 18, and November 15, 2012, January 18, March 21, June 6, July 24, August 1, 9, 18, 23, September 23, October 18, and 25 2013, January 10, 28, February 12, March 4, April 1, 9 and May 14, 2014.  *Id*.  During this same period of time his chart was reviewed and/or updated fourteen times, he received written responses to his letters from mental health professionals on several occasion,[2] psychology staff spoke with his family three times, he was scheduled to see

---

[2]     Liller avers that all mail received in the Psychology Department is logged in with a date received by the Secretary.  The mail is read by Liller or his designee and then distributed to the inmate's treatment provider. Concerns raised by inmates are frequently discussed in the departmental morning briefings.  If follow up is required Liller either attends meetings about the inmate's concerns or responds to the inmate after discussing the issue with the inmate's treatment provider.  Staff of the Psychology Department reinforce with inmates the importance of respecting the chain of command.  *Id*., Ex. 6.

psychology staff on six occasions which were cancelled due to security concerns, and Plaintiff refused to be seen on three other occasions. *Id*., Ex. 4, p. 3; Ex. 6, p. 3.

Norma J. Holwager, Licensed Clinical Professional Counselor, confirms that Plaintiff frequently raised concerns about his mental health care treatment and his housing.  Holwager discussed Plaintiff's concerns with Liller who directed Holwager to have Plaintiff raise his concerns directly with Liller.  *Id*., Ex. 5.  Holwager indicates that Plaintiff inquired about his placement in the SNU and she advised him that she understood from Liller that Plaintiff did not qualify for placement due to his disruptive behavior.  *Id*.

Holwager also states that she spoke with Plaintiff's mother on July 31, 2013, after she inquired about Plaintiff's condition.  She told Holwager she received a letter from Plaintiff stating he was being abused by officers on the tier.  Holwager reports receiving a similar letter and forwarding it to Liller who responded to Plaintiff.  Holwager advised Plaintiff's mother that psychological staff did not deal with those types of complaints and there was a process for investigating Plaintiff's concerns.  Plaintiff was advised that he should address his concerns to his housing team or file an ARP.  Holwager provided Plaintiff's mother the name and telephone number of the warden if she felt she needed to have her concerns further addressed.  *Id*.

Holwager spoke with Plaintiff on August 1, 2013, at his cell door and advised him she spoke with his mother.  Plaintiff insisted Holwager speak to the Warden on his behalf as to his claim of abuse by staff.  Holwager advised Plaintiff that she would follow procedures set out by Liller in his letter to Plaintiff addressing Plaintiff's concerns about staff and housing.  *Id.,* Ex. 5. Staff of the Psychology Department reinforce with inmates the importance of respecting the chain of command.  *Id*., Ex. 6.

Mere disagreement with a course of treatment does not provide the framework for a federal civil rights complaint.  *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975). "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present.  *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor.  Plaintiff has failed to submit any evidence to support his claim that the mental health care providers provided constitutionally inadequate medical care.  To the contrary the evidence before the court, including the records presented by Plaintiff, demonstrates that Plaintiff's concerns were regularly addressed.  He was not deemed suitable for placement on the SNU. Mental health providers endeavored to assist Plaintiff in his transitioning to general population but he has resisted their efforts as well as their efforts to improve his health through individual counselling.  Plaintiff's mere disagreement with the care provided, including his housing assignment, does not state an Eighth Amendment claim.

### Conclusion

The dispositive motion filed on behalf of Defendants will be granted.  A separate Order follow.

Date: February 26, 2015                      _____/s/_____
                                             DEBORAH K. CHASANOW
                                             United States District Judge

12